**United States District Court**
For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                        NORTHERN DISTRICT OF CALIFORNIA
7
8    LESLIE FILLMORE,                              No. C-10-03655 JCS
9              Plaintiff,                          **ORDER DENYING DEFENDANT'S
                                                   MOTION FOR SUMMARY
10        v.                                       JUDGMENT, GRANTING PLAINTIFF'S
                                                   MOTION FOR SUMMARY
11   MICHAEL J. ASTRUE,                            JUDGMENT, REVERSING DECISION
                                                   OF THE COMMISSIONER AND
12             Defendant.                          REMANDING FOR FURTHER
     _____/            PROCEEDINGS** [Docket Nos. 13, 15]
13

## I.   INTRODUCTION

Leslie Fillmore ("Plaintiff") seeks review of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying his Application for disability insurance

and Supplemental Security Income ("SSI") benefits under the Social Security Act ("SSA").  Plaintiff

asks the Court to reverse the Commissioner's denial of benefits and remand with instructions to

award benefits or, in the alternative, for additional administrative proceedings.  For the reasons

stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's

Motion for Summary Judgment, reverses the decision of the Commissioner and remands for further

proceedings.[1]

## II.   BACKGROUND

### A.   Procedural Background

Plaintiff applied for disability benefits on September 12, 2007, alleging he became unable to

work because of diabetes on January 31, 2007.  Administrative Record ("AR") 85.  The claim was

_____

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to
28 U.S.C. § 636(c).

United States District Court

For the Northern District of California

1 initially denied on November 6, 2007 and denied upon reconsideration on March 14, 2008.  AR 97.

2 Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was

3 scheduled for August 11, 2009 in Oakland, California before ALJ Richard Laverdure ("the August

4 11 hearing").  *Id.* at 27-51.   Although Plaintiff did not appear at the August 11 hearing, testimony

5 was taken from vocational expert Jeff Nelson at that time.  *Id.* at 27-51 (hearing transcript).  A

6 supplemental hearing was held on November 5, 2009, at which time Plaintiff appeared and testified.

7 *Id.* at 52-84.  Vocational expert Dr. Gerald Belchick also testified.  *Id.* at 54-55.  Plaintiff was

8 represented at the hearing by Roger Lin, an attorney with Homeless Action Center.  On January 22,

9 2010, the ALJ issued a decision denying benefits, finding that Plaintiff was not disabled as defined

10 by the Social Security Act because he could perform jobs that existed in significant numbers in the

11 national economy.  *Id.* at 6.  The ALJ's decision became final when the Appeals Council declined

12 review on July 28, 2010.  *Id.* at 1-3.

13    Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) , which gives the Court jurisdiction

14 to review the final decision of the Commissioner.   The parties have filed cross-motions for summary

15 judgment.

16    **B.    Plaintiff's Background**

17    Plaintiff was 58 years old as of the alleged onset date of his disability, January 31, 2007.  AR

18 162 (date of birth 10/10/1948).  Plaintiff's previous work experience included serving in the Navy

19 for five years, the Army for ten years, and as a deckhand for the U.S. military for 18 years.  *Id.* at

20 167-174, 333.  He received his GED while working for the U.S. Navy.  *Id.* at 45, 351.  Between

21 2001 and early 2007, Plaintiff worked for United Parcel Service ("UPS") loading and unloading

22 trucks.  *Id.* at 172-174.  In October of 2007, Plaintiff reported to a treating physician that he was

23 homeless.  *Id.* at 292.

24    **C.    Medical Evidence**

25    **1.    Physical Health**

26    In December 2006, Plaintiff visited the Veterans Affairs Clinic ("VA Clinic") in Martinez,

27 California, complaining of "numbness" and "tingling" in his feet and hands.  AR 289.   He was seen

28

2

United States District Court

For the Northern District of California

1   by RN Clifford Flores. *Id.* at 288-290. Lab tests were performed and Plaintiff was diagnosed with

2   diabetes mellitus. *Id.* at 286-288.

3           Plaintiff had a diabetic consultation with Nurse Practitioner Ada Suzuki ("Nurse Practitioner

4   Suzuki") on December 27, 2006. *Id.* During this appointment, Nurse Practitioner Suzuki reviewed

5   Plaintiff's laboratory results with him, issued him a glucose monitor and showed him how to use it.

6   *Id.* at 287. She directed Plaintiff to use Accu-Chek glucose test strips two to three times a week, and

7   to take one tablet of Metformin daily for diabetes management. *Id.* at 286. In the notes for this visit,

8   Nurse Practitioner Suzuki described Plaintiff as an "[a]lert, pleasant MALE in [no apparent

9   distress]." *Id.* at 287. Neurologically, she described him as "[a]lert and oriented to time, place and

10  person." *Id.* She noted that he walked with a "normal gait" and that his mood and affect were

11  "normal." *Id.*

12          On January 25, 2007, Plaintiff was seen at the VA Clinic for an optometry consultation in

13  connection with his diabetes. *Id.* at 284-286.

14          Nurse Practitioner Suzuki also referred Plaintiff to a dietician, Ruth Knittel, and Plaintiff

15  attended a diabetes management class with Ms. Knittel on February 6, 2007. *Id.* at 266-67. The

16  class presented Plaintiff with a variety of information on how to eat and exercise properly. *Id.*

17          Plaintiff was seen by Nurse Practitioner Suzuki again on April 5, 2007 for evaluation and lab

18  review. AR 281-284. During this visit he complained of hearing loss. *Id.* A notation for

19  "extremities" stated only "no edema." Nurse Practitioner Suzuki again described Plaintiff as "[a]lert

20  and oriented to time, place, and person." *Id.* at 283. Nurse Practitioner Suzuki offered a referral for

21  a colonoscopy but Plaintiff declined the referral. *Id.* at 284.

22          On May 31, 2007, Nurse Practitioner Suzuki saw Plaintiff for a scheduled primary care visit.

23  *Id.* at 277. During this visit, Plaintiff told Nurse Practitioner Suzuki that he was under "increased

24  stress, his building was sold [and that] he ha[d] no job." *Id.* He complained of "chronic foot pain."

25  *Id.* Nurse Practitioner Suzuki referred Plaintiff to the radiology department, where x-rays of

26  Plaintiff's feet were taken on the same day. *Id.* at 248. The films were reviewed by Dr. Stanley

27  Reich, M.D., who reported:

28          The left foot shows mild spurring about the talonavicular joint. The right foot shows a
            minimal plantar spur. No other significant findings revealed.

3

United States District Court

For the Northern District of California

1   *Id*. at 248.  He noted that the "primary diagnostic code" was "MINOR ABNORMALITY."  *Id.*

2       On October 20, 2007, Dr. Frank Chen performed a comprehensive internal medicine

3   evaluation of Plaintiff in connection with Plaintiff's application for social security disability

4   benefits.  *Id.* at 291.  Dr. Chen listed Plaintiff's complaints as "1. Diabete mellitus. 2. Painful feet. 3.

5   Shaking of the right hand when he writes. 4. Insomnia. 5.  Hypertension."  *Id*. at 291.  In describing

6   the "[h]istory of present illness," he noted that Plaintiff experienced "[s]ymptoms of pain in his feet

7   that is affecting his balance when he gets up too quick."  *Id*.  He also noted that Plaintiff was

8   homeless.  *Id*. at 292.  Dr. Chen found that during the examination Plaintiff was in no acute distress,

9   walked "without any difficulty" and "sat comfortably."  *Id*. at 292.  Dr. Chen found that Plaintiff

10  suffered from no abnormal neurological deficit affecting his coordination, that he was able to

11  perform the finger-to-nose test and  heel-to-knee test, and that his gait was "normal and steady."  *Id*.

12  at 293.  He noted that Plaintiff did not use any assistive devices.  *Id*.  Dr. Chen  reported that

13  Plaintiff had normal muscle bulk and tone, and full strength (5/5) in upper and lower extremities.  *Id.*

14  at 294.  Dr. Chen noted that Plaintiff's diabetes was under control.  *Id.*  Dr. Chen's "functional

15  assessment/ medical source statement" included the following: no restrictions on the number of

16  hours Plaintiff could stand, walk, or sit during an eight-hour work day; the ability to lift and carry

17  100 pounds occasionally and 50 pounds frequently with no postural limitations on bending, stooping

18  or crouching, and no manipulative limitations on reaching, handling, feeling, grasping or fingering.

19  *Id*.

20      State agency physician C. Richard Dann, M.D., who apparently reviewed Plaintiff's medical

21  records but did not examine Plaintiff, agreed with Dr. Chen's medical source statement, concluding

22  in an entry dated October 31, 2007 that Plaintiff's complaints of pain in his feet and hands were not

23  credible and that therefore that this impairment was "nonsevere."  *Id*. at 295-296.

24      On February 4, 2008, Nurse Practitioner Suzuki spoke to Plaintiff on the telephone and noted

25  as follows:

26      Signed employability medical statement stating to employable, no work restrictions [as stated
        in original]. Last seen 5-31-07, canceled podiatry consult for chronic foot pain.  Patient has
27      not made f/u appt with this PCP since then.  Sent form back to ROI.

28  *Id*. at 316.

United States District Court

For the Northern District of California

1    On February 14, 2008, Nurse Practitioner Suzuki examined Plaintiff, who came in for a

2   same-day visit complaining of chronic bilateral foot pain. *Id*. at 313. She noted that Plaintiff told

3   her he had not been able to make it to some past appointments, including a podiatry appointment to

4   which Nurse Practitioner Suzuki had previously referred him, due to "eviction problems." *Id*. at

5   313, 315. According to Nurse Practitioner Suzuki, Plaintiff reported that his foot pain was "worse

6   than last year" and that he was "unable to stand." *Id*. at 314. She ordered new x-rays and another

7   podiatry referral. *Id*. at 415. The x-rays were completed on the same day and showed no change

8   from the previous year's x-rays. *Id*. at 302.

9    On March 4, 2008, Plaintiff saw Podiatry Surgical Specialist Dr. Stephen Silver. *Id.* at 329.

10   Dr. Silver described Plaintiff's complaint as follows:

11       constant foot pain present for about one year, throbbing aching and tingling of feet. he has
         sensation of feeling he is wearing a shoe that is too small, currently unable to jog. his hands
12       also have tingling.

13   *Id*. at 329. Dr. Silver noted that "past treatment –  medication for diabetes, and x-rays" –  had "not

14   helped [Plaintiff's] feet." *Id.* Dr. Silver observed that Plaintiff's gait was "antalgic" but found "no

15   gross foot deformity." *Id.* He found that Plaintiff's muscle groups had normal tone and strength.

16   *Id.* Dr. Silver recommended that Plaintiff return to his primary care physician "for medical

17   management of painful small fiber sensory neuropathy." *Id.* at 330.

18    On March 15, 2008, another state agency physician, Dr. Corazon C. David, M.D., who also

19   did not examine Plaintiff, found that there had been no change as to Plaintiff's feet and therefore,

20   that Dr. Dann's finding that Plaintiff's impairment was non-severe remained appropriate. *Id.* at 317.

21    On July 18, 2008, Plaintiff returned to Dr. Silver for a follow-up visit, complaining of

22   "constant pain of hand and feet which keeps him awake at night." *Id*. at 325. Dr. Silver noted that

23   Plaintiff had not followed up with his primary physician for medical management of his pain and

24   again recommended that Plaintiff do so. *Id*.

25    On July 15, 2009, Nurse Practitioner Suzuki completed a Medical Source Statement for

26   Plaintiff ('the July 2009 Medical Source Statement"), stating that she had last seen Plaintiff on

27   March 14, 2008 and that his prognosis was "painful small fiber sensory neuropathy." *Id*. at 324.

28   She found that Plaintiff could  lift and carry 25 pounds occasionally and ten pounds frequently and

could stand and walk for at least two hours in an eight hour day. *Id.* at 323. She referenced "foot films and podiatry visits" as the medical findings that supported her assessment. *Id.* Nurse Practitioner Suzuki further indicated that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl throughout the day and would have no problem reaching, handling, fingering, and feeling. *Id.* at 324. The July 2009 Medical Source Statement is signed not only by Nurse Practitioner Suzuki but also by Dr. Nguyen-Dinh.[2]

### 2.    Mental Health

Plaintiff's only consultation with a mental health expert reflected in the record took place on June 4, 2009. AR 332-40. Licensed clinical psychologist Dr. Ede Thomsen, Ph.D., to whom Plaintiff was referred by his attorney, performed a full clinical evaluation of Plaintiff and diagnosed him with Adjustment Disorder with Mixed Anxiety and Depressed Mood, Obsessive-Compulsive Personality Traits, and Anti-Social and Narcissistic Personality Features. *Id.* at 340. Dr. Thomsen stated in her assessment that Plaintiff's "current symptoms of anxiety and depression began when he 'lost everything' and became homeless in 2005/2006." *Id*. at 332. She further opined that "[h]e has features and traits of personality disorder that were most likely present since he was in his late teens/early 20's." *Id.* According to Dr. Thomsen, Plaintiff denied ever participating in any prior psychological assessments. *Id.* at 333.

Under the heading "Functional Exam," Dr. Thomsen stated that Plaintiff had been experiencing "symptoms of anxiety and mild depression" since he became homeless, in 2005/2006; that his hygiene was good; and that he has "impaired attention/concentration, executive functioning, immediate memory abilities, and visuospatial abilities." *Id.* at 334. She further stated that he has "somewhat poor decision making abilities currently due to his anxiety [and that] [t]his may negatively impact his ability to manage his personal affairs, think clearly, and make well informed decisions." In addition, she found that [h]e may have some difficulty accomplishing his activities of daily living due to his difficulty ambulating and his severe anxiety." *Id.*

_____

[2]Although the signature on the Medical Source Statement is illegible, the parties agree that the signature is that of a medical doctor. *See* Defendant's Motion for Summary Judgment at 12 n. 1 (stating that although the record includes no reference to Dr. Nguyen-Dinh other than references to him by Plaintiff's attorney and the  illegible signature, the "Commissioner gives Plaintiff the benefit of the doubt and treats this July 2009 form as an acceptable medical source's opinion").

United States District Court
For the Northern District of California

1    Under the heading "Behavioral Observations and Mental Status," Dr. Thomsen opined that

2  Plaintiff "appeared sad but cooperative throughout the assessment . . .[and that] [h]is interview

3  behavior was friendly and open." *Id.* She also stated that Plaintiff had limited insight into his

4  feelings and psychiatric symptoms. *Id.* Nonetheless, Dr. Thomsen found that Plaintiff "appears to

5  have good judgment." *Id.*

6    Dr. Thomsen listed the following procedures administered during Plaintiff's examination: 1)

7  Clinical Interview; 2) Repeatable Battery for Assessment of Neuropsychological Status (RBANS) -

8  Form A; 3) Trail Making A & B; 4) Clock Drawing Task; 5) Mini Mental Status Examination

9  (MMSE); 6) Barona Estimate (IQ); 7) Beck Depression Inventory (BDI-II); 8) Beck Anxiety

10  Inventory (BAI); 9) Millon Clinical Multiaxial Inventory – III (MCMI0III); and 10) Mental

11  Status/Psychiatric Symptoms Sheet. *Id.*

12    Based on the cognitive functioning tests, Dr. Thomsen found that Plaintiff had severe

13  impairments in the areas of attention/concentration and executive functioning, and a moderate

14  impairment in memory. *Id.* at 335. In terms of Plaintiff's "Overall Intellectual Functioning," Dr.

15  Thomsen found that Plaintiff's premorbid IQ was in the average range, though he scored a 30/30 on

16  the mini-mental status exam. *Id.* at 334.

17    In the area of attention/concentration, Dr. Thomsen found that Plaintiff had a "severe

18  deficit." *Id.* at 335. She found that Plaintiff was able to successfully repeat a string of five digits

19  and subtract a string of sevens starting from 100 but that it took him an abnormally long period time

20  to do so, which placed him in the "moderately/severely impaired range of functioning." *Id.* at 335.

21  Dr. Thomsen reported that Plaintiff's performance on the RBANS Attention Index placed him "in

22  the borderline range of functioning at the 5th percentile." *Id.* Dr. Thomsen opined that overall,

23  Plaintiff's difficulties in the domain of attention/concentration "are due to his psychiatric symptoms

24  and high stress level." *Id.*

25    In the area of executive functioning, which entails the ability to plan, sequence, and organize,

26  Dr. Thomsen found that Plaintiff "is functioning in the severely impaired range." *Id.* Plaintiff's

27  performance on the Trails B, "a set shifting task," placed Plaintiff in the moderately/severely

28  impaired range due to the amount of time it took Plaintiff to complete the task. *Id.* Dr. Thomsen

United States District Court
For the Northern District of California

also noted that Plaintiff "evidenced several self-corrected set shifting errors while completing the task" and that although he "did not evidence any concrete errors on his clock drawing task . . .he drew the hour hand longer than the minute hand resulting in the clock showing the wrong time." Finally, she found that Plaintiff was capable of performing a three-step command.  *Id.*

In the area of memory, Dr. Thomsen found that Plaintiff was moderately impaired.  *Id.*  In particular, Plaintiff's performance on the RBANS Immediate Memory Index placed him in the borderline range at the seventh percentile; Dr. Thomsen noted that Plaintiff "struggled" with the list learning task and the story memory task.  *Id.*  Dr. Thomsen further reported that Plaintiff's performance on the RBANS Delayed Memory Index was in the average range at the 50th percentile. *Id.*  Dr. Thomsen assessed Plaintiff's recognition memory and determined that overall, "his performance suggests that he [is] able to learn new information but needs a great deal of practice and repetition to do so due to his poor attention/concentration abilities."  *Id.*

With respect to Plaintiff's emotional functioning, Dr. Thomsen determined that Plaintiff's results on the Beck Depression Inventory indicate that he was experiencing minimal to mild depression.  *Id.* at 336.  Plaintiff's Beck Anxiety Inventory results indicate to Dr. Thomsen that Plaintiff was experiencing "severe" anxiety.  *Id.*  Specifically, Dr. Thomsen noted that Plaintiff's responses to the anxiety test included "numbness or tingling" and "wobbliness in his legs" and that he was "unable to relax," "dizzy or lightheaded," "experiencing having his heart pound or race," "feeling unsteady, nervous, and shaky,"  had "feelings of choking," and was "experiencing having his hands tremble."  *Id.*

Based on the results of Plaintiff's MCMI-II, an "objective test of psychiatric functioning," Dr. Thomsen found that Plaintiff has a "need for social approval or a naivete about psychological matters" and "a fear a public humiliation, a rigid and tense compliance with social conventions and propriety, and receptivity to the beliefs and values of institutional authorities (e.g., church, business)."  *Id.* at 337.  Moreover, Dr. Thomsen opined that "[u]nless [Plaintiff] receives clear guidance as to what is correct or proper, he may be quite indecisive and easily upset.  Deviations from his routine often produce anxiety."  *Id.* at 338.  Plaintiff's most prominent personality features, according to Dr. Thomsen, include:

> his inclination to exhibit an unusual adherence to social conventions and propriety, leading to a preference for polite, formal, dutiful, and 'correct' personal relationships. He is deferential, ingratiating, and even obsequious with superiors, going out of his way to impress them with his efficiency and serious-mindedness. He may seek the reassurance and approval of authority figures, experiencing considerable anxiety when he is unsure of their wishes or expectations. This contrasts markedly with his treatment of subordinates, with whom he is quite autocratic and condemnatory, often appearing pompous and self-righteous. This haughty and deprecatory manner is usually cloaked by so-called regulations and legalities.

*Id.* From the MCMI-III test, Dr. Thomsen concluded that Plaintiff's "Obsessive-Compulsive Personality Traits, Antisocial Personality Features, and Narcissistic Personality Features" are "long-term or chronic traits that are likely to have persisted for several years prior to the present assessment." *Id.* at 338-39.

In the conclusion section of her report, Dr. Thomsen noted that Plaintiff was "currently staying with a friend who is in a wheelchair whom he assists in exchange for having a place to stay temporarily." *Id.* at 339. She stated that based on the assessment, Plaintiff had a "severe deficit in attention/concentration, executive functioning, visual spatial abilities, and a moderate deficit in memory functioning and sensory/motor functioning." *Id.* She stated that Plaintiff's "psychiatric symptoms interfere with his ability to make decisions, resolve problems, and effectively manage his daily affairs currently. His cognitive problems seem to be the result of his psychological symptoms. He is under a great deal of stress, which makes him vulnerable to decompensation if demands are placed upon him; this makes his ability to be successful at a job site severely limited." *Id.* She further stated that Plaintiff "avoids social involvement because of his low energy and anxiety," which "may create difficulties in a work environment, especially when he needs to interact with coworkers or supervisors." *Id.* She continued, "[h]is relationships are limited and he is socially isolated." Finally, Dr. Thomsen concluded that as a result of Plaintiff's difficulty with attention/concentration, "[h]e could not sustain simple or complex tasks for up to eight hours and would be fatigued while attempting to do so." *Id.*

Finally, Dr. Thomsen concluded that Plaintiff was not malingering based on his results on the MCMI-III. *Id.* at 337. She further noted that Plaintiff was a "reliable and credible source of information throughout the evaluation given the depth of information he shared about his life along with his lack of symptom exaggeration and his openness during the interview." *Id.* at 339.

9

**D.      The Administrative Hearing**

The ALJ held an administrative hearings on August 11, 2009 ("the August 11 hearing"), at which Plaintiff did not appear, and a supplemental hearing on November 5, 2009 ("the November 5 hearing"), at which Plaintiff did appear.  At the November 5 hearing, Plaintiff told the ALJ that he had been unable to attend the previous hearing because he was caring for his roommate, who suffers from multiple sclerosis and had fallen in the bathroom that morning.  *Id.* at 56.  Plaintiff testified that he currently lives in Oakland, California with this individual, who is elderly.  *Id.*  Plaintiff described his roommate as his "buddy" with whom he spends most of his time "hanging around."  *Id.* at 59. Plaintiff testified that in exchange for free housing he sat with his roommate, sometimes "fixed him coffee or something to eat" and performed a "little minor clean up," which he completed "in sections," working a little while then sitting down to rest.  *Id.* at 60.

Plaintiff testified that he stopped working because of the constant pain in his feet, ankles, legs, knees, and hands.  *Id.* at 59-60.  He further testified that his finger tips were "real sore where [he couldn't] really work with them" and that he frequently dropped things.  *Id.* at 59-60.  Plaintiff testified that his balance had deteriorated, that he had fallen a few times, and that his feet dragged. *Id.* at 60.

The ALJ questioned Plaintiff about why he had not had sought any medical treatment since March 2008 and in particular, why Plaintiff had not followed Dr. Silver's instructions that he return to his primary care physician for medical management of his neuropathy.  *Id.* at 64-65.   Plaintiff testified that he was unable to get a ride to the VA Clinic and that he couldn't ride the shuttle because he had been told in connection with a recommended procedure that required sedation that he had to have someone who would take him to the VA Clinic and pick him up.  *Id.* at 57-59.  He also testified that he did "not have the finance" to get to the VA Clinic and that his daughter was unable to drive him there because of her job.  *Id.* at 74-75.  Finally, he testified that when he goes to the VA Clinic, he always has to wait to see the doctor, that when x-rays are done, the doctors always "say they can't find nothing," and that the doctors refused to give him medicine for his pain.  *Id.* at 74.

Plaintiff testified that he takes his diabetes medication, which he receives in the mail, regularly.  *Id.* at 73.

1    Plaintiff's attorney elicited testimony from Plaintiff about his ability to lift. *Id*. at 76-77.

2    Plaintiff testified that he could not lift 50 pounds for about two hours of the work day if he had to

3    walk while lifting because his "feet and legs ain't going to let that work," and that he if he were

4    required to lift 25 pounds for eight hours, he would be "one miserable person at the end of the . . .

5    day." *Id*.

6    At the conclusion of the hearing, the ALJ told Plaintiff's counsel that he would leave the

7    record open to allow Plaintiff to submit additional evidence addressing the ALJ's concerns. *Id*. at

8    83; *see also* AR 72 (statement by ALJ suggesting to Plaintiff's counsel that he obtain further

9    information from Plaintiff's treating sources addressing whether Plaintiff's impairment would have

10   improved if he had obtained further treatment of his neuropathy, as recommended, and regarding the

11   availability of transportation to the VA Clinic in Martinez).

12   **i.      Supplemental Letter Submitted Following the November 5 Hearing**

13   On November 17, 2009, within the two weeks allowed by the ALJ to supplement the record,

14   Plaintiff's attorney submitted a letter from Nurse Practitioner Suzuki that stated as follows:

15               Leslie Fillmore has been a patient at the Veterans Affairs Clinic since December 13,
16           2006.

17               The VA Clinic diagnosed Mr. Fillmore with diabetes and painful small fiber sensory
     neuropathy.  Mr. Fillmore frequently refills and takes his medications (which include Accu-
     Check Comfort CV (Glucose) Test Strips, Dextrose and Glipizides) to treat these disorders.
18

19               Mr. Fillmore was last seen at the VA Clinic on March 14, 2008.  At that time, despite
     his ongoing treatment with the Clinic, his condition had not improved.  Thereafter, on July
20           15, 2009, I assessed his maximum ability to lift objects frequently at 10 lbs and occasionally
     at 20 lbs.  Further, based on foot films and podiatry visits, I also determined that his
21           maximum ability to stand and/or walk with normal breaks was for at least 2 hours but under
     6 hours, in an 8 hour workday.

22               Given Mr. Fillmore's age, diabetes and painful small fiber sensory neuropathy, his
     ability to lift/carry objects and to stand/walk will *not* improve with medical treatment.  As
23           Mr. Fillmore consistently takes his prescribed medication and monitors his glucose levels,
     even if Mr. Fillmore came into the VA Clinic between the dates of March 14, 2008 and July
24           15, 2009, our medical staff could not make his ability to lift/carry objects or stand/walk
     improve.

25               Please contact me at the VA Clinic if you have any additional questions.

26

27   *Id*. at 359.

28

1         **E.**     **The  ALJ's Five-Step Analysis and Findings of Fact**

2         Disability insurance benefits are available under the Social Security Act when an eligible

3 claimant is unable "to engage in any substantial gainful activity by reason of any medically

4 determinable physical or mental impairment . . . which has lasted or can be expected to last for a

5 continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

6 § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such

7 severity that he is not only unable to do his previous work but also "cannot, considering his age,

8 education, and work experience, engage in any other kind of substantial gainful work which exists in

9 the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in

10 establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

11 (1996).

12         The Commissioner has established a sequential five-part evaluation process to determine

13 whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step

14 One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."

15 20 C.F.R. § 404.1520(a)(4)(I).  If he is, the Commissioner finds that the claimant is not disabled, and

16 the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner

17 proceeds to Step Two and considers whether the claimant has "a severe medically determinable

18 physical or mental impairment," or combination of such impairments, which meets the duration

19 requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the

20 claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the

21 claimant does not have a severe impairment, disability benefits are denied at this step.  If it is

22 determined that one or more impairments are severe, the Commissioner will next perform Step

23 Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled

24 listing of impairments that the Commissioner has found to be disabling.  20 C.F.R. §

25 404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments meet or equal a listed

26 impairment, the claimant is found to be disabled.  Otherwise, the Commissioner proceeds to Step

27 Four and considers the claimant's residual functional capacity ("RFC") in light of his impairments

28 and whether the claimant can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R.

United States District Court

For the Northern District of California

§ 404.1560(b) (defining past relevant work).  If the claimant can still perform previous work, he is found not to be disabled.  If the claimant cannot perform past relevant work, the Commissioner performs the fifth and final step of the analysis.  20 C.F.R. § 404.1520(a)(4)(v).  At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997).  A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits.  20 C.F.R. § 404.1520(f).  Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id.*

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the  mental impairment.  *Clayton v. Astrue*, 2011 WL 997144, at * 3 (E.D. Cal. Mar. 17, 2011)  (citing 20 C.F.R. §§ 404.1520a 416.920a).   These regulations provide, in relevant part, as follows:

(a) General. The steps outlined in § 404.1520 apply to the evaluation of physical and mental impairments. In addition, when we evaluate the severity of mental impairments for adults (persons age 18 and over) and in persons under age 18 when Part A of the Listing of Impairments is used, we must follow a special technique at each level in the administrative review process.

Using the technique helps us:

(1) Identify the need for additional evidence to determine impairment severity;

(2) Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and

(3) Organize and present our findings in a clear, concise, and consistent manner.

(b) Use of the technique.

(1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). See § 404.1508 for more information about what is needed to show a medically determinable impairment. If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

United States District Court
For the Northern District of California

(2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.
(c) Rating the degree of functional limitation.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) Use of the technique to evaluate mental impairments. After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

14

**United States District Court**
For the Northern District of California

20 C.F.R. § 404.1520a(a) - (d).  Under the regulations, the ALJ is required to incorporate the pertinent findings and conclusions based on the technique outlined above in his or her decision.  20 C.F.R. § 404.1520a(e)(4).  As part of this requirement, the ALJ must "include a specific finding as to the degree of limitation in each of the functional areas" described above. *Id*.

At Step One, the ALJ found no evidence that the Plaintiff has engaged in substantial gainful activity since the alleged disability onset date of January 31, 2007.  AR 11.

At Step Two, the ALJ determined that Plaintiff's history of diabetes mellitus with mild peripheral neuropathy was "a severe medically determinable physical . . .  impairment" because it significantly limits Plaintiff's ability to perform basic work activities.  *Id.*  With respect to Plaintiff's mental impairment, the ALJ found that the objective medical evidence supported Plaintiff's diagnosis of adjustment disorder but that the impairment was "non-severe" because it only minimally limited Plaintiff's ability to perform "basic mental work activities."  *Id.*  The ALJ discounted Plaintiff's testimony that his homelessness and severe physical condition had "caused him to become depressed and anxious" and as a result had worsened his ability to maintain the activities of daily living, pointing to Plaintiff's admission to Dr. Thomsen that he had never been in therapy or taken psychotropic medication. *Id*.

The ALJ also did not credit Dr. Thomsen's opinions because: 1) Plaintiff had obtained Dr. Thomsen's opinion "solely for purposes of pursuing this claim;" 2) Plaintiff had no history of treatment or medication, even though he had access to VA facilities; and 3) Dr. Thomsen had no particular relationship with Plaintiff that would warrant giving her opinion significant weight.  *Id*. at 11-12.  The ALJ went on to address the four functional areas that are set forth in the regulations for evaluating mental disorders, that is: 1) activities of daily living; 2) social functioning; 3) concentration, persistence and pace; and 4) episodes of decompensation.  *Id*. (citing 20 C.F.R., Part 404, Subpart B, Appendix 1).

First, with respect to activities of daily living, the ALJ found that Plaintiff had no limitations on the activities of daily living, citing Plaintiff's testimony that he was caring for his roommate.  *Id*. at 12. The ALJ reasoned that Plaintiff's "ability to take care of another disabled person [was] inconsistent with his allegations that his mental impairment interferes with his activities of daily

United States District Court

For the Northern District of California

1    living." *Id.*.  Second, the ALJ found that Plaintiff had no limitations as to social functioning.  In

2    particular, the ALJ rejected Plaintiff's testimony that he had no social life due to his depression,

3    citing Plaintiff's testimony that he had been "hanging out with his buddy" since he stopped working.

4    Based on this testimony, the ALJ found that Dr. Thomsen's opinion that Plaintiff would have

5    difficulty in a work environment due to his tendency to avoid social involvement was overstated.  *Id*.

6     Third, the ALJ found that in the area of concentration, persistence or pace, Plaintiff would only

7    have mild limitations, if any, because he was able to pay attention throughout the entire

8    administrative hearing.  *Id.*  In connection with this functional area, the ALJ also noted that Dr.

9    Thomsen had characterized Plaintiff as "friendly and open" and "oriented to person, place and time."

10   *Id.*  Finally, the ALJ found no episodes of decompensation that would satisfy the fourth area.  *Id.*

11         At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of

12   impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,

13   Subpart P, Appendix 1.  *Id.* at 13.  The ALJ considered Plaintiff's diabetes mellitus under Listing

14   9.08.  *Id.*  Under that Listing, diabetes mellitus is disabling if it is experienced in conjunction with

15   neuropathy evidenced by "significant and persistent disorganization of motor function in two

16   extremities resulting in sustained disturbance of gross and dexterous movements," or one of two

17   other physical manifestations not applicable to Plaintiff.  *Id.*  The ALJ found that there was "no

18   evidence from an acceptable medical source" that Plaintiff's neuropathy was severe enough to

19   satisfy the Listing's requirement.  *Id.*

20         At Step Four, the ALJ determined that Plaintiff has the RFC to perform the full range of

21   medium work as defined in 20 C.F.R. §§ 404.1567(c)[3] and 416.967(c).  *Id.*  In support of this

22

23         [3]Section 404.1567(c) provides as follows:

24   To determine the physical exertion requirements of work in the national economy, we classify jobs as
     sedentary, light, medium, heavy, and very heavy. These terms have the same meaning as they have in
25   the Dictionary of Occupational Titles, published by the Department of Labor. In making disability
     determinations under this subpart, we use the following definitions:
26

27   (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally
     lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined
28   as one which involves sitting, a certain amount of walking and standing is often necessary in carrying
     out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary
     criteria are met.

**United States District Court**

For the Northern District of California

1   conclusion, the ALJ first determined that Plaintiff had an underlying medically determinable

2   physical or mental impairment that could reasonably be expected to produce the Plaintiff's claimed

3   pain. He then addressed the intensity, persistence, and limiting effects of the Plaintiff's symptoms to

4   determine the extent to which they limited his ability to perform basic work activities.  *Id.*  The ALJ

5   stated that whenever Plaintiff's statements about the limiting effects of his pain were not

6   substantiated by objective medical evidence, he determined the credibility of Plaintiff's statements

7   based on consideration of  the entire case record . *Id.* at 14.

8          The ALJ did not find Plaintiff's statements about the intensity, persistence and limiting

9   effects of his symptoms to be "entirely credible."  *Id.*  In particular, the ALJ did not find credible

10  Plaintiff's statement that he cannot work with his hands; his legs, ankles and knees hurt constantly;

11  he cannot do any prolonged lifting, sitting or standing; and any exertion causes him considerable

12  pain.  *Id.*  The ALJ cited Plaintiff's ability to take care of another disabled person, including his

13  ability to do "small chores" for his friend such as "light cleaning or getting him some coffee."  *Id.*

14  The ALJ also based his conclusion on the fact that Plaintiff had not received "any medical care"

15  since July 2008.  The ALJ found unpersuasive Plaintiff's testimony that he had not been able to

16  obtain transportation to the VA Clinic, noting that Plaintiff had provided no verification for his

17  testimony that he was not permitted to ride the shuttle to the VA.  *Id.* at 15.

18

19  _____

20  (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or
    carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job
21  is in this category when it requires a good deal of walking or standing, or when it involves sitting most
    of the time with some pushing and pulling of arm or leg controls. To be considered capable of
22  performing a full or wide range of light work, you must have the ability to do substantially all of these
    activities. If someone can do light work, we determine that he or she can also do sedentary work, unless
23  there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of
    time.
24
    (c) Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting
25  or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that
    he or she can also do sedentary and light work.
26
    (d) Heavy work. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting
27  or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he
    or she can also do medium, light, and sedentary work.
28

United States District Court

For the Northern District of California

1    Finally, the ALJ found that the objective medical evidence was consistent with his

2  conclusion that Plaintiff could perform medium work, and *inconsistent* with the disabling levels of

3  pain alleged by Plaintiff. *Id.* The ALF cited evidence that Plaintiff's diabetes mellitus was "well

4  controlled with medication," that the 2007 x-rays of Plaintiff's feet showed only a "mild

5  abnormality," and that podiatrist Stephen Silver found that there was no evidence of a deformity,

6  even though Plaintiff's gait was antalgic. *Id.* The ALJ also found that the treatment Plaintiff

7  received for his peripheral neuropathy was "essentially routine and conservative," suggesting that

8  Plaintiff's symptoms were not as severe as Plaintiff alleged. *Id.* In addition, the ALJ cited the

9  findings of examining physician Frank Chen, who noted that Plaintiff was in "no acute distress" and

10  walked without an assistive device during his visit. *Id.*

11    The ALJ acknowledged that Nurse Practitioner Suzuki found that Plaintiff had the maximum

12  ability to lift 10 pounds frequently and 20 pounds occasionally in the July 2009 Medical Source

13  Statement, but declined to give it controlling weight. *Id.* at 16. He also rejected the opinion

14  expressed by Nurse Practitioner Suzuki in her November 6, 2009 letter, that even if Plaintiff had

15  come in to the VA Clinic between March 14, 2008 (when she last saw Plaintiff) and July 15, 2009

16  for treatment, his ability to lift/carry objects or stand/walk would not have improved. *Id.* at 16. The

17  ALJ stated, "Ms. Suzuki, a nurse practitioner who did not treat the claimant on a regular basis,

18  lacked the expertise and the objective medical findings to support her conclusion that the claimant's

19  condition or pain *would not improve*, even if he had sought continuous treatment, as he was urged to

20  do. . . . If that were the case, one must wonder why the treatment and follow-ups were recommended

21  by the claimant's specialists." *Id.*

22    The ALJ also did not credit the opinion of Dr. Chen to the extent that Dr. Chen found that

23  Plaintiff would be able to occasionally lift and carry 100 pounds and frequently lift and carry 50

24  pounds. *Id.* Rather, the ALJ found that the "medical evidence as a whole" indicated that Plaintiff's

25  abilities were more limited. *Id.*

26    At Step Five, the ALJ found that Plaintiff was unable to perform any of his past relevant

27  work because his work loading and unloading freight is classified as a semi-skilled job that is

28  generally and actually performed at a heavy level, thus exceeding Plaintiff's RFC. *Id.* at 16-17.

1   The ALJ then considered whether there were jobs existing in significant numbers in the national

2   economy that Plaintiff could perform in light of his age, education, past work experience and RFC.

3   *Id.* at 17.  Applying Medical-Vocational Guideline 203.04, which directs a finding of "not disabled"

4   for claimants who are "closely approaching retirement age" on the alleged disability onset date, have

5   limited education but can speak English, and have an RFC that permits medium-level work, the ALJ

6   found that Plaintiff was not disabled.  *Id.*

7            **D.**      **The Summary Judgment Motions**

8                    **1.**         **Plaintiff's Contentions**

9            Plaintiff contends that the ALJ erred at Steps Two, Three, Four and Five of his analysis and

10   therefore, that his decision should be reversed and the case remanded to the Commissioner for award

11   of benefits, or, in the alternative, further proceedings.

12           At Step Two, Plaintiff challenges the ALJ's conclusion that Plaintiff's mental impairment is

13   not severe.  Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") at 12-14; Plaintiff's

14   Reply in Opposition to Defendant's Cross- Motion for Summary Judgment ("Reply") at 2-6.

15   Plaintiff argues that the ALJ's failure to credit Dr. Thomsen's opinion constitutes legal error because

16   the ALJ did not provide clear and convincing reasons for doing so, as required when an examining

17   physician's opinion is uncontradicted, as is Dr. Thomsen's.  Plaintiff's Motion 12-13.  In particular,

18   Plaintiff argues that the ALJ's reliance on the fact that Dr. Thomsen's opinion was solicited by

19   counsel was improper.  *Id*. at 13.  Plaintiff further asserts that the ALJ's reliance on Plaintiff's lack

20   of mental health treatment is not a clear and convincing reason for rejecting Dr. Thomsen's

21   opinions.  *Id*. (citing *Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  Finally, Plaintiff

22   contends that the ALJ erred when he found that:  a) Plaintiff's ability to spend time with and care for

23   a disabled friend meant that he had no limitations in daily activities or social functioning; and b)

24   Plaintiff's ability to pay attention without difficulty during the administrative hearing meant that he

25   had only a mild impairment in concentration, persistence, and pace.  *Id.* at 14.

26           At Step Three, Plaintiff contends that the ALJ did not provide legally sufficient reasons in

27   support of his conclusion that Plaintiff's physical impairment does not meet the criteria in Listing

28   9.08 of the Social Security regulations, instead making only a "boilerplate finding" that there was no

United States District Court

For the Northern District of California

1    evidence from an acceptable medical source that Plaintiff's diabetes mellitus satisfied the

2    requirements of that listing. Plaintiff's Motion at 20. Plaintiff asserts that in "failing to address Dr.

3    Nguyen-Dinh as an Acceptable Medical Source in regards to Listing 9.08," the ALJ erred. *Id*.

4    (citing *Lewis v. Apfel*, 236 F.3d503, 512 (9th Cir. 2001)).

5          With respect to the determination of Plaintiff's RFC at Step Four, Plaintiff argues that the

6    ALJ committed legal error in rejecting the VA team's opinion, as stated in the July 2009 Medical

7    Source Statement, for the following reasons: 1) he did not offer specific and legitimate reasons

8    supported by substantial evidence; and 2) he failed to recontact Plaintiff's treatment team to resolve

9    any discrepancies he found in the medical records as required by *Smolen v. Chater*. Plaintiff's

10   Motion at 9-12, 19-20 (citing 80 F.3d 1273, 1279 (9th Cir. 1996)).

11         Plaintiff argues that pursuant to *Winans v. Bowen*, the ALJ should have accorded the

12   opinions of those who treated him – that is, the VA Clinic team, including Nurse Practitioner Suzuki

13   and Dr. Nguyen Dinh – more weight than the opinions of non-examining physicians, such as the

14   contrary opinions of the State Agency Medical Consultants. Plaintiff's Motion at 10 (citing 853

15   F.2d 643, 647 (9th Cir. 1987)). Plaintiff further contends that the reasons offered by the ALJ for

16   failing to give controlling weight to the opinions of the VA Clinic team do not constitute substantial

17   evidence. *Id*. First, Plaintiff argues, the ALJ erred in relying on Plaintiff's lack of treatment at the

18   VA Clinic between March 14, 2008 and July 15, 2009, upon which he based his conclusion that

19   Plaintiff's condition would have improved had he sought follow-up treatment for his pain from his

20   primary care provider, as Dr. Silver recommended. *Id*. Plaintiff argues that the ALJ erred in failing

21   to consider that the July 2009 Medical Source Statement was based, in part, on Dr. Silver's records,

22   which showed that Plaintiff continued to experience pain in March 2008, despite receiving treatment

23   and medications for his diabetes. *Id*. at 11. Dr. Silver's records, Plaintiff contends, provided Nurse

24   Practitioner Suzuki with medical evidence showing that Plaintiff's condition would *not* have

25   improved if he had obtained treatment between March 2008 and July 2009. *Id*.

26         Second, Plaintiff argues, the ALJ erred in dismissing the opinions of Nurse Practitioner

27   Suzuki on the basis that she was not an acceptable medical source, arguing that even if the ALJ did

28   not give the Medical Source Statement controlling weight, he should have addressed the appropriate

1   weight to be given Nurse Practitioner Suzuki's opinion in light of the factors set forth in the

2   regulations, namely, "length of the treatment relationship and the frequency of examination, nature

3   and extent of the treatment relationship, supportability, consistency and specialization." *Id.* (citing

4   20 C.F.R. §§ 404.157(d)(2), 416.927(d)(2). Considering these factors, Plaintiff contends, the ALJ

5   should have given Nurse Practitioner Suzuki's opinion significant weight. *Id.* Moreover, Plaintiff

6   argues, the Medical Source Statement was signed by Dr. Nguyen-Dinh, who is an acceptable

7   medical source. *Id.*

8       Third, Plaintiff asserts, if the ALJ found that there was a discrepancy between the opinion

9   stated in Nurse Practitioner Suzuki's November 6, 2009 letter (that Plaintiff's symptoms would not

10  have improved with treatment) and the notes from Dr. Silver (recommending that Plaintiff return to

11  his primary care team for further treatment of his symptoms), he had a duty to develop the record by

12  contacting the VA Clinic team to learn more about the basis for Nurse Practitioner Suzuki's opinion

13  that Plaintiff's symptoms would not have improved with treatment. *Id.* at 12.  In discounting the

14  opinion of the VA Clinic team without further inquiry, Plaintiff asserts, the ALJ failed to meet the

15  requirement that he conduct an appropriate inquiry. *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273,

16  1288 (9th Cir. 1996)).

17      Plaintiff argues that the ALJ also erred at Step Four in rejecting Plaintiff's testimony about

18  the severity of his symptoms because: 1) Plaintiff's daily activities in connection with caring for his

19  roommate was not a clear and convincing reason for concluding that Plaintiff was capable of

20  medium work; and 2) Plaintiff's failure to seek medical treatment since July 2008 was not a clear

21  and convincing reason for discounting Plaintiff's testimony in light of Plaintiff's testimony

22  regarding his difficulties in getting to the VA Clinic, as well as Plaintiff's mental impairment, which

23  makes deviations from Plaintiff's normal routine difficult. *Id.* at 14-18.

24      At Step Five, Plaintiff argues that the ALJ should have applied Medical-Vocational

25  Guideline 201.06 (which applies where a claimant can perform only sedentary work), rather than

26  203.04 (which applies where a claimant can perform medium work), because substantial evidence in

27  the record establishes that Plaintiff was able to perform only sedentary work. *Id.* at 21-22.

28

**2.     Defendant's Contentions**

Defendant counters that the ALJ did not err at Step Two because he had "good reasons" for rejecting the opinion of Dr. Thomsen and that finding that Plaintiff's mental impairment is non-severe was supported by substantial evidence. Defendant's Motion for Summary Judgment ("Defendant's Motion") at 6-9.  According to Defendant, under the regulations, a mental impairment that causes no more than mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that does not cause any episodes of decompensation is "generally not severe."  *Id*. at 6 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The ALJ offered substantial evidence of non-severity under this standard, Defendant contends, because he cited evidence that: 1) Plaintiff was open and friendly with Dr. Thomsen; and 2) Plaintiff was able to pay attention throughout the hearing.  Further, to the extent that the ALJ rejected the opinion of Dr. Thomsen as to the severity of Plaintiff's mental impairment, Defendant argues that he offered legally sufficient reasons for doing so, based on the entire record.  *Id*. at 7 (citing 20 C.F.R. §§ 404.1527, 416.927).  These reasons included the fact that Dr. Thomsen's opinion was solicited by counsel and Plaintiff's lack of prior treatment for any mental impairment.  *Id*. at 8-9.  As to the former, Defendant asserts that the ALJ was permitted to consider the circumstances under which Dr. Thomsen's opinion was obtained and to give it less weight because it was obtained only to support Plaintiff's disability claim after the Commissioner had denied Plaintiff's claim initially and on reconsideration.  *Id*. (citing *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998); *Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996); *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996)).  Defendant argues that the ALJ properly considered Plaintiff's lack of treatment for any mental health impairment because Plaintiff's "excellent work history" was inconsistent with Dr. Thomsen's suggestion that Plaintiff had suffered from his mental impairment his entire life.  *Id*. at 8.

At Step Three, Defendant claims that the ALJ's conclusion that Plaintiff does not meet or equal Listing 9.08, the listing for diabetes mellitus, was supported by substantial evidence because Plaintiff did not show that he had "significant and persistent disorganization of motor functioning in two extremities resulting in sustained disturbance of gross and dextrous movements, or gait and station," as required under Listing 9.08. *Id.* at 9 (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990);

1    *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999)). According to Defendant, sustained

2    disturbance of gross and dextrous movements is the same as "inability to perform fine and gross

3    movements effectively." *Id.* at 10 (citing 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00B(2)(c)).

4    Defendant further asserts that sustained disturbance of gait and station is the same as "inability to

5    ambulate effectively," which in turn, requires that an individual use a hand-held assistive device that

6    "limits the functioning of both upper extremities, e.g., a walker, two canes, or two crutches. *Id.*

7    (citing 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00B(2)(b)). According to Defendant, the medical

8    evidence does not show that these requirements are met. *Id.* at 10-11.

9         With respect to Plaintiff's feet, Defendant points out that: 1)  Nurse Practitioner Suzuki

10    observed that Plaintiff walked with a normal gait (AR 271, 279); 2) the July 2009 Medical Source

11    Statement found that Plaintiff could work, even though his functional capabilities were more limited

12    than the ALJ found; and 3) Dr. Chen noted that Plaintiff walked without difficulty and did not use an

13    assistive device (AR 292).  *Id.*  As to Plaintiff's gross and dextrous movements, Defendant points

14    out that the July 2009 Medical Source Statement found that Plaintiff could reach, handle, finger and

15    feel without limitations.  *Id.*  Defendant further cites evidence that Plaintiff was able to care for a

16    friend with multiple sclerosis, including performing light chores such as preparing a meal or coffee,

17    which shows that his diabetes mellitus was not accompanied by sustained disturbance in gross or

18    dextrous movements.  *Id.*  According to Defendant, this evidence is sufficient to show that the ALJ

19    did not err in finding that Plaintiff did not meet the requirements of Listing 9.08.  *Id.*

20         At Step Four, Defendant contends that the ALJ's RFC was supported by substantial evidence

21    and that he gave "good reasons" for deciding not to give the opinions expressed by Nurse

22    Practitioner Suzuki and Dr. Nguyen-Dinh's in the July 2009 Medical Source Statement much

23    weight.  *Id.* at 12.  Defendant cites the ALJ's  finding that Nurse Practitioner Suzuki did not treat

24    Plaintiff regularly and had not seen him in over a year when she completed the Medical Source

25    Statement.  *Id.* at 13.  According to Defendant, this limited treating relationship with Plaintiff is a

26    legitimate reason for discounting Nurse Practitioner Suzuki's opinion.  *Id.* (citing 20 C.F.R. §§

27    404.1527(d)(2), 416.927(d)(2)).  In addition, Defendant argues, the ALJ properly found that Nurse

28    Practitioner Suzuki failed to identify medical evidence that supported her conclusion;  in particular,

United States District Court

For the Northern District of California

1   although she cited the x-rays and notes from Plaintiff's podiatry visits, those records simply

2   documented Plaintiff's complaints and did not contain any significant findings. *Id*. In contrast,

3   Defendant argues, Dr. Chen's report – which the ALJ credited at least to some degree – contained a

4   more detailed discussion of his medical findings, including range of motion and neurological test

5   results such as reflexes, motor strength, and sensation. *Id*. at 13. Defendant also points to the

6   notation by Nurse Practitioner Suzuki in her notes from February 2008, which Defendant contends

7   state that Plaintiff was employable with no work restrictions, arguing that this inconsistent earlier

8   opinion provides another legitimate reason for discounting the July 2009 Medical Source Statement.

9   *Id*.

10          Defendant contends that the ALJ also did not err in rejecting the opinion expressed in Nurse

11   Practitioner Suzuki's November 2009 letter, that Plaintiff's capabilities would not have improved if

12   he had obtained treatment from his primary care physician after March 2008. *Id*. at 14. In

13   particular, because the letter was not signed by a doctor, the ALJ was entitled to give less weight to

14   the letter because it was not from an acceptable medical source. *Id*. Defendant further contends that

15   the ALJ properly disregarded the letter because of Nurse Practitioner Suzuki's limited treatment

16   relationship with Plaintiff and because of the lack of objective findings supporting her opinion. *Id*.

17          Defendant rejects Plaintiff's argument that the ALJ erred by failing to recontact the VA

18   Clinic team to obtain further information because that duty only applies when there is ambiguous

19   evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Id.* at 15

20   (citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). The evidence in the record is

21   not ambiguous, Defendant contends, and therefore, the ALJ did not have a duty to further develop

22   the record. In any event, the ALJ satisfied any such duty, according to Defendant, by leaving the

23   record open for the submission of additional evidence by the claimant. *Id.* (citing *Tonapetyan v.*

24   *Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)).

25          Finally, Defendant argues that the ALJ provided valid reasons for finding that Plaintiff's

26   testimony about the severity of his disability was not credible in light of the objective medical

27   evidence in the record. *Id.* at 15-18. Specifically, the ALJ cited the findings of Dr. Chen that

28   Plaintiff could stand, walk and sit without limitation, the observation by both Dr. Chen and Nurse

United States District Court

For the Northern District of California

1    Practitioner Suzuki that Plaintiff had normal muscle strength (indicating an absence of atrophy that

2    often results from inactivity related to debilitating pain, Defendant argues), and Plaintiff's treatment

3    history, including Plaintiff's failure to receive medical care after July 2008. *Id*. at 17. Defendant

4    argues that Plaintiff's testimony that he lacked transportation to the VA Clinic for treatment was not

5    persuasive because his counsel did not obtain verification from the VA Clinic that transportation was

6    not available, even though the ALJ raised this issue at the hearing. *Id*. Further, Defendant argues,

7    Plaintiff's testimony that he had been told he could not ride the shuttle to the VA Clinic related to a

8    procedure involving sedation and therefore has no bearing on whether Plaintiff could take the shuttle

9    to obtain treatment for his feet. *Id*.

10        At Step Five, Defendant argues that the ALJ did not err in applying Medical-Vocational

11   Guideline 203.04 because he correctly determined that Plaintiff's RFC renders him capable of

12   medium work. Motion at 19-20. Defendant asserts that because that guideline directs a finding of

13   "not disabled," the Commissioner's denial of benefits should be upheld.

14   **III.    ANALYSIS**

15        **A.    Legal Standard**

16        When asked to review the Commissioner's decision, the Court takes as conclusive any

17   findings of the Commissioner which are free from legal error and supported by "substantial

18   evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might

19   accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

20   Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance."

21   *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988). Even if the

22   Commissioner's findings are supported by substantial evidence, they should be set aside if proper

23   legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v.*

24   *Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both

25   the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80

26   F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

27

28

**United States District Court**
For the Northern District of California

1

2    **B.    Whether the ALJ Erred at Step Two in Finding Plaintiff's Mental Impairment was Non-Severe**

3    Plaintiff contends that the ALJ erred at Step Two because he failed to provide clear and

4    convincing reasons for rejecting the uncontroverted opinions of Dr. Thomsen that Plaintiff's mental

5    impairment was severe.  The Court agrees.

6    In the Ninth Circuit, courts "distinguish among the opinions of three types of physicians: 1)

7    those who treat the claimant (treating physicians); 2) those who examine but do not treat the

8    claimant (examining physicians); and 3) those who neither examine nor treat the claimant

9    (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  In *Lester v.*

10   *Chater*, the court set forth the general standards that are applied in determining the relative weight to

11   be given to the medical opinions of these three types of physicians:

12       As a general rule, more weight should be given to the opinion of a treating source than to the
         opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th

13       Cir.1987).  At least where the treating doctor's opinion is not contradicted by another doctor,
         it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

14       1391, 1396 (9th Cir.1991). We have also held that "clear and convincing" reasons are
         required to reject the treating doctor's ultimate conclusions. *Embrey v. Bowen*, 849 F.2d 418,

15       422 (9th Cir.1988). Even if the treating doctor's opinion is contradicted by another doctor,
         the Commissioner may not reject this opinion without providing "specific and legitimate

16       reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*,
         722 F.2d 499, 502 (9th Cir.1983).

17
          The opinion of an examining physician is, in turn, entitled to greater weight than the opinion
18       of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v.
         Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating

19       physician, the Commissioner must provide "clear and convincing" reasons for rejecting the
         uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the

20       opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by
         another doctor, can only be rejected for specific and  legitimate reasons that are supported by

21       substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

22   *Id*.  However, even where the opinions of an examining doctor are uncontradicted, the ALJ may

23   reject those opinions or give them only minimal weight if they "are conclusory, brief, and

24   unsupported by the record as a whole, . . . or by objective medical findings."  *Batson v.*

25   *Commissioner of Soc. Security*, 359 F.3d 1190, 1195 (9th Cir.  2004)(citing *Tonapetyan v. Halter*,

26   242 F.3d 1144, 1149 (9th Cir.2001) (holding that ALJ can reject the opinion of a treating physician

27   whether or not that opinion is contradicted)).

28

1    The burden at Step Two is relatively light.  In particular, the Ninth Circuit has held that "the

2    step two inquiry is a de minimis screening device to dispose of groundless claims."  *Smolen v.*

3    *Chater*, 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153-54 (1987)).

4    Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the

5    evidence establishes a slight abnormality that has 'no more than a minimal effect on an individuals

6    ability to work.'" *Id.* (citing SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th  Cir. 1988)

7    (adopting SSR 85-28)).

8    Here, the ALJ rejected the opinions of Dr. Thomsen, which show that Plaintiff's mental

9    impairment is severe.  Because Dr. Thomsen is an examining physician and she is the *only* physician

10   who evaluated Plaintiff's mental impairment, the ALJ was required to provide clear and convincing

11   reasons for rejecting her opinion and make specific findings supported by substantial evidence as to

12   the degree of limitation in each of the functional areas listed above.  In light of the low threshold for

13   establishing that an impairment is severe at Step Two, and for the reasons stated below, the Court

14   finds that the reasons offered by the ALJ for rejecting Dr. Thomsen's opinions are not clear and

15   convincing and further, that his findings as to the functional areas set forth in the regulations for

16   determining the severity of a mental impairment are not supported by substantial evidence.

17                   **1.      Circumstances under Which Dr. Thomsen's Opinion Was Obtained**

18   The ALJ found that Dr. Thomsen's opinion should not be given controlling weight based, in

19   part, on the fact that the opinion was solicited by counsel in connection with Plaintiff's social

20   security claim.  Because the Court finds that Dr. Thomsen's opinion is consistent with the other

21   medical evidence in the record and there is no indication of any improprieties in connection with her

22   opinion, the Court concludes that the circumstances under which the report was obtained do not

23   provide a legitimate reason  – much less a clear and convincing reason – for rejecting her opinion.

24   In *Reddick v. Chater*, the Ninth Circuit addressed the question of whether an ALJ may reject

25   a medical opinion on the basis that it was solicited by counsel in connection with the claimant's

26   disability claim.  157 F.3d 715, 726 (9th Cir. 1998).   Addressing an apparent tension in the Ninth

27   Circuit's case law, the court stated:

28           In *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir.1988), we rejected a doctor's opinion in a letter
             requested by counsel where the opinion was unsupported by medical findings, personal

27

observations, or test reports. *Id.* at 1339-40. We noted in *Burkhart* that "given the evidence before the ALJ, [the fact that the letter had been solicited by counsel] was not the only reason the ALJ gave for rejecting (the doctor's) statements." *Id.* at 1339. However, in *Lester*, where there was no sound basis for rejecting a doctor's opinion that had been solicited by counsel, we stated that "the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." 81 F.3d at 832. In *Saelee v. Chater*, 94 F.3d 520 (9th Cir.1996), citing *Lester*, we rejected a doctor's opinion letter where "actual improprieties" had been found. *Id.* at 523. In *Saelee*, the doctor's opinion letter varied from his treatment notes and "was worded ambiguously in an apparent attempt to assist [the claimant] in obtaining social security benefits." *Id.* at 522. In that case, the ALJ found that there was "no objective medical basis for the opinion." Id. at 523.

We clarify here that, in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it.

*Id.* Conversely, "[e]vidence of the circumstances under which the report was obtained and its consistency with other records, reports, or findings could . . . form a legitimate basis for evaluating the reliability of the report." *Id.*

In *Reddick*, the court held that the ALJ had erred in rejecting a letter written by the claimant's treating physician in response to questions from the claimant's counsel and disability insurance carrier, finding that the opinions stated in the letter were based on three years of treatment and were consistent with the opinions expressed by the physician over that time. *Id.* Similarly, in *Nguyen v. Chater*, cited by Plaintiff, the court found that the ALJ had erred in rejecting an examining psychologist's opinion on the basis that it was solicited by the claimant's attorney, finding that there was no indication of "actual impropriety" and, in contrast to *Saelee*, the psychologist's report was based on an examination and a battery of tests. 100 F.3d 1462, 1464 (9th Cir. 1996). The court concluded, "[t]hat does not mean that [the examining psychologist] was correct or that his report must prevail, but it does mean that [his] credibility is not subject to attack on the basis of the source of his patient's referral." *Id.*

In this case, as in *Reddick* and *Nguyen*, the opinion expressed by Dr Thomsen was supported by a battery of tests and an extensive examination. Her findings are not conclusory or ambiguous but rather, are clearly stated and supported by her observations and test results. Nor is there any indication that Dr. Thomsen engaged in impropriety with respect to her report. Finally, as discussed below, the medical record does not contradict Dr. Thomsen's opinion, contrary to the assertions of

1   the Commissioner.  Therefore, the Court concludes that the ALJ erred to the extent that he rejected

2   Dr. Thomsen's opinion on the basis of the circumstances under which it was obtained.

3                 **2.      Plaintiff's Failure to Obtain Mental Health Treatment**

4           The ALJ further cited in support of his rejection of Dr. Thomsen's opinion Plaintiff's lack of

5   treatment for his mental impairment, including his failure to participate in any therapy or receive any

6   prescriptions for psychotropic medications.  In *Nguyen*, however, the Ninth Circuit cautioned that in

7   the case of mental impairments, it may not be appropriate to infer based on failure to obtain

8   treatment that a claimant's impairment is not severe.  The Court finds that the concerns expressed in

9   *Nguyen* are particularly salient here.

10          In *Nguyen,* the ALJ rejected the opinion of an examining psychologist who examined the

11  claimant at the request of his counsel and found, based on the examination and the results of a

12  battery of tests, that the claimant suffered from severe depression and therefore met a listing

13  establishing disability.  100 F.3d at 1464.  The ALJ implicitly rejected the opinion of the examining

14  psychologist (although he did not expressly state that he was rejecting his opinion), relying instead

15  on the opinion of a consulting physician (who did not examine the claimant) that the claiment's

16  impairment did *not* meet the listing.  *Id.*  The ALJ appeared to rely, in part, on the fact that there was

17  no record of the claimant having sought any treatment for his mental impairments in the three years

18  prior to the examination by the examining psychologist.  *Id.*  Applying the "specific and legitimate"

19  standard that applies when the examining physician's opinion is contradicted by the opinion of

20  another physician, the court concluded that the claimant's failure was not a specific and legitimate

21  reason for giving greater weight to the opinion of the consulting physician than that of the examining

22  physician, reasoning as follows:

23          it is common knowledge that depression is one of the most underreported illnesses in the
            country because those afflicted often do not recognize that their condition reflects a
24          potentially serious mental illness. See, e.g., Warren E. Leavy, Hidden Depression, Chi. Trib.,
            Feb. 1, 1996 at 7 (noting that nearly 17 million adult Americans suffer from depression in a
25          given year and that two-thirds of them do not get treatment). Thus, the fact that claimant may
            be one of millions of people who did not seek treatment for a mental disorder until late in the
26          day is not a substantial basis on which to conclude that [the examining psychologist's]
            assessment of claimant's condition is inaccurate. As the Sixth Circuit has noted in finding
27          invalid an ALJ's reasons for rejecting claimant's assertions about his depression, '[a]ppellant
            may have failed to seek psychiatric treatment for his mental condition, but it is a questionable
28          practice to chastise one with a mental impairment for the exercise of poor judgment in
            seeking rehabilitation.' *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989).

1    *Id*. at 1465.

2         *Nguyen* does not set forth a bright-line rule that failure to receive treatment for a mental

3    impairment can *never* provide a legitimate reason for rejecting the opinions of an examining or

4    treating physician.  Indeed, several district courts have distinguished *Nguyen* where the medical

5    record showed that a claimant had received a diagnosis or some limited treatment for a mental

6    impairment but failed to follow up on treatment recommendations.  *See, e.g., King v. Astrue*, 2010

7    WL 5300856, at * 10 (E.D.Cal. Dec. 17, 2010) (holding that ALJ did not err in considering

8    claimant's failure to seek treatment for mental impairment where she had received treatment for

9    mental impairment from primary care physician but had failed to follow recommendation from

10   primary care physician that she obtain treatment for mental impairment from mental health

11   specialist); *Beasley v. Astrue,* 2010 WL 4717108, at *5 n.1 (E.D. Wash., Nov. 15, 2010) ( holdings

12   that ALJ did not err in considering claimant's failure to seek treatment for anxiety where "Plaintiff

13   was advised consistently to seek treatment for his reported anxiety symptoms" and offered no

14   explanation for failing to follow those recommendations).  In this case, however, the facts of *Nguyen*

15   are on point.  There is no evidence or testimony in the record that Plaintiff had ever participated in

16   any psychological assessment, much less been diagnosed with a mental impairment, before he was

17   examined by Dr. Thomsen.  Nor is there any evidence in the record that anyone had ever

18   recommended that Plaintiff receive treatment for such an impairment.  Moreover,  Dr. Thomsen

19   found that Plaintiff had "limited insight into his feelings and psychiatric symptoms," further

20   weakening any inference that might be drawn that Plaintiff's failure to seek mental health treatment

21   was because his mental impairment was not severe.  AR 351, 352.  Under these circumstances,

22   Plaintiff's failure to obtain prior treatment for his mental impairment is not a clear and convincing

23   reason (or even a legitimate reason) for failing to credit Dr. Thomsen's opinions regarding the

24   severity of his mental impairment.

25

26

27

28

United States District Court

For the Northern District of California

**3.      Whether Dr. Thomsen's Opinion Was Inconsistent With the Record**

The ALJ also discredited Dr. Thomsen's opinion on the basis that it was inconsistent with the record, addressing the functional areas set forth in the regulations for determining the severity of a mental impairment.   The Court addresses the four functional areas below.[4]

**a.      Activities of Daily Living**

The ALJ found that Plaintiff had no limitations on his activities of daily living, citing Plaintiff's testimony that he took care of his roommate, who has multiple sclerosis.  AR 12.  The Court concludes that the ALJ did not provide clear and convincing reasons supported by substantial evidence for rejecting Dr. Thomsen's conclusion that Plaintiff would have "some difficulty accomplishing his activities of daily living."  AR 334.

Dr. Thomsen's opinion is supported by an examination and a battery of tests that were performed to evaluate Plaintiff's mental impairment; moreover, she reached this conclusion despite the fact that Plaintiff cared for his roommate – a fact that she acknowledge in her report.  AR 339. The ALJ's opinion that Plaintiff's ability to care for his roommate supported a contrary conclusion is supported by no medical evidence, in contrast to the cases cited by the Commissioner, in which the ALJ discounted the opinion of a treating or examining physician based on conflicting medical evidence in the record, such as the opinion of a consultative physician who reached a contrary conclusion.  *See, e.g., Batson v. Comm'r of Soc. Security*, 359 F. 3d 1190, 1195 (9th Cir. 2004) (holding that ALJ properly declined to credit opinion of treating physician that was in the form of a checklist, was not supported by medical evidence *and* was contradicted by the opinion of a physician who conducted a consultative medical evaluation); *Andrews v. Shalala*, 53 F3d. 1035, 1042 (9th Cir. 1995) (holding that ALJ properly declined to credit opinion of examining psychologist where

_____

[4]In Defendant's Motion, the Commissioner asserts that the ALJ properly rejected Dr. Thomsen's opinion based on a possible contradiction that the ALJ mentioned at the August 11 hearing but did not cite in his written decision, namely, Plaintiff's "excellent work history."  Defendant's Motion at 8. According to Defendant, this statement is inconsistent with Dr. Thomsen's statement that Plaintiff likely exhibited certain "features and traits" of his personality disorder in his teens or early twenties.  The Court may not rely on a reason that was not offered by the ALJ in his decision.  *Pinto v. Massanari*, 249 F.3d 840, 847-848 (9th Cir. 2001).  In any event, the record does not reflect any inconsistency on this question.  Although Dr. Thomsen noted that "features and traits" of Plaintiff's personality disorders were likely present in his teens or early twenties, she clearly stated that "[h]is current symptoms of anxiety and depression began when . . .he became homeless in 2005/2006."  AR 333.  Thus, Plaintiff's ability to work before that time is not inconsistent with Dr. Thomsen's diagnosis.

United States District Court

For the Northern District of California

1  opinion was solicited by counsel, plaintiff admitted to the psychologist that he had no interest in

2  pursuing treatment for his alleged impairment and that he "manipulated situations to his advantage,"

3  *and* where a non-examining psychologist who had reviewed the record and whose opinion the court

4  found could be credited because of her expertise had testified at the administrative hearing and

5  offered specific reasons for concluding that the opinion of the examining psychologist was

6  unreliable).  In this case, there is no evidence that any psychologist other than Dr. Thomsen

7  addressed the severity of Plaintiff's mental impairment.  The Commissioner did not seek the opinion

8  of a medical expert, either to conduct an examination or to evaluate Dr. Thomsen's opinion in light

9  of the entire record, although the regulations permitted him to do so.  *See* 20 C.F.R. §

10  404.1520a(e)(5).

11       Therefore, the Court finds that the ALJ failed to provide clear and convincing reasons

12  supported by substantial evidence that Plaintiff suffered no impairment as to his activities of daily

13  living.

14                    **b.     Social Functioning**

15       The ALJ found that Plaintiff had no limitations in the area of social functioning, again citing

16  that fact that Plaintiff was able to "spend time with and care for his disabled friend."  AR at 12.  The

17  Court concludes that the ALJ did not provide clear and convincing reasons supported by substantial

18  evidence for rejecting Dr. Thomsen's conclusion that Plaintiff was impaired as to social functioning.

19       Dr. Thomsen found that Plaintiff would have "difficulties in a work environment, especially

20  when he needs to interact with co-workers or supervisors accomplishing his activities of daily

21  living."  AR 339.  She found that "Plaintiffs relationships are limited and he is socially isolated," and

22  that this "social alienation would make working effectively with others difficult currently."  *Id*.  As

23  noted above, Dr. Thomsen's opinion is based on an examination and a battery of tests.  Further, Dr.

24  Thomsen reached this conclusion even though she was aware of Plaintiff's relationship with his

25  roommate, acknowledging that his relationships were "limited."  Thus, the ALJ's opinion that

26  Plaintiff had no difficulty with social functioning because he could spend time with a single friend is

27  directly contrary to Dr. Thomsen's opinion.  Given that the ALJ's opinion is supported by no

28

1  medical evidence, the Court finds that this reason is not a clear and convincing reason supported by

2  substantial evidence that Plaintiff has no impairment as to social functioning.

3                              **c.**            **Concentration, Persistence and Pace**

4         The ALJ found that Plaintiff would have "only mild limitations" as to concentration,

5  persistence and pace, "if any."  AR at 12.  In doing so, he relied on the fact that Plaintiff was "able to

6  pay attention without any difficulties during the entire hearing" and Dr. Thomsen's observation that

7  Plaintiff was "open and friendly" during his examination.  *Id.*  The Court concludes that the ALJ did

8  not provide clear and convincing reasons supported by substantial evidence for rejecting Dr.

9  Thomsen's conclusion as to this area of functioning.

10         Dr. Thomsen conducted extensive tests and concluded, *inter alia*, that in light of Plaintiff's

11  severe  impairments as to his attention/concentration, executive functioning, visuospatial abilities,

12  and sensory/motor functioning, as well as his moderate impairment of memory functioning, Plaintiff

13  "could not sustain simple or complex tasks for up to eight hours and would be fatigued while

14  attempting to do so."  AR at 339.  The ALJ offers no medical evidence in support of his conclusion

15  that Dr. Thomsen's opinion was incorrect.   He fails to explain why Dr. Thomsen's observation that

16  Plaintiff was "open and friendly" and "oriented as to person, place and time" is inconsistent with Dr.

17  Thomsen's other findings, including those relating to attention/concentration.  Nor does he explain

18  how Plaintiff's ability to "pay attention" for the entire hearing conflicted with Dr. Thomsen's

19  finding that Plaintiff is severely impaired in this functional area.  Indeed, the ALJ's reasoning is

20  flawed, on its face, given that the hearing did not last anywhere close to eight hours and during the

21  hearing the only task Plaintiff was asked to complete was to answer questions about his activities

22  and symptoms.         The ALJ failed to provide clear and convincing reasons supported by

23  substantial evidence that Plaintiff was not severely limited  as to attention, persistence and pace.

24                  **d.**      **Decompensation**

25         Plaintiff does not contest the ALJ's finding that his medically determinable mental

26  impairment causes "no episodes of decompensation," which is the fourth functional area of

27  assessment.  AR 12 (quotation omitted).

28

United States District Court

For the Northern District of California

1

### e.  Conclusion

2      Because the ALJ failed to provide clear and convincing reasons for rejecting the findings and

3  opinions of Dr. Thomsen and because the ALJ's finding that Plaintiff's mental impairment is not

4  severe is not supported by substantial evidence in the record, the ALJ erred at Step Two.

5

### C.  Whether the ALJ Erred at Step Three in Finding that Plaintiff's Symptoms Do Not Meet Listing 9.08

6

7      Plaintiff contends that the ALJ's finding at Step Three, that Plaintiff did not meet Listing

8  9.08, was not supported by substantial evidence and that the evidence in the record shows that

9  Plaintiff's neuropathy in his hands and feet is sufficient to establish that Plaintiff is disabled under

10  this Listing.  The Court disagrees.

11      Listing 9.08 establishes that an individual with diabetes mellitus is disabled if his symptoms

12  include "[n]europathy demonstrated by significant and persistent disorganization of motor

13  functioning in two extremities resulting in sustained disturbance of gross and dexterous movements,

14  or gait and station," 20 C.F.R. Part 404 Subpt. P § 9.08A.  Sustained disturbances of gross and

15  dexterous movements involve an inability to effectively perform fine and gross movements such as

16  preparing meals or feeding and cleaning oneself.  20 C.F.R. Part 404 Subpt. P Appendix 1 §

17  1.00B(2)(c).  Sustained disturbances of gait and station involve an inability to ambulate effectively

18  without the use of assistive devices that require the use of two hands.  20 C.F.R. Part 404 Subpt. P

19  Appendix 1 § 1.00 B(2)(b).

20      Here, the ALJ stated that "[t]here is no evidence from an acceptable medical source that the

21  claimant's diabetes mellitus satisfies the requirements" of the Listing.  AR 13.  The Court finds that

22  there is substantial evidence to support this conclusion.  *See* AR 324 (July 2009 Medical Source

23  Statement stating that Plaintiff could reach, handle, finger, and feel without limitation); AR 56,60

24  (Plaintiff's testimony that he prepares meals, feeds and cleans himself and assists his friend with

25  multiple sclerosis in some of these daily tasks); AR 271, 279 (Nurse Practitioner Suzuki's report that

26  Plaintiff walked without difficulty during examination); AR 291 -294 (Dr. Chen's report that

27  Plaintiff had "normal muscle bulk and tone," that this "gait was normal and steady," that he was

28  "walking without any difficulty," that Plaintiff did not use an assistive device during the exam and

1   that Plaintiff would be able to occasionally lift and carry 100 pounds and frequently lift and carry 50

2   pounds); AR 329 (Dr. Silver's report that Plaintiff had normal muscle tone).   Further, to the extent

3   that the ALJ found that Plaintiff's testimony about his neuropathy symptoms was not fully credible,

4   the Court finds that the ALJ's conclusion is supported by substantial evidence, as discussed below.

5

6       **D.      Whether the ALJ Erred at Step Four in Determining that Plaintiff's RFC
                  Renders Him Capable of Medium-Level Work**

7           Plaintiff contends that the ALJ erred at Step Four in finding that Plaintiff could perform

8   medium work because: 1)  he did not offer specific and legitimate reasons supported by substantial

9   evidence for rejecting the opinions of the VA Clinic team who treated him, as reflected in the July

10  2009 Medical Source Statement; 2) he did not provide clear and convincing evidence for rejecting

11  Plaintiff's pain testimony; and 3) he failed to recontact the VA Team to resolve any ambiguities in

12  the record.  The Court finds that the ALJ offered legally sufficient reasons, supported by substantial

13  evidence, for finding that Plaintiff could perform medium work and that the ALJ did not have a duty

14  to recontact the VA Clinic team to resolve ambiguities.

15

16      **1.      Whether the ALJ Erred in Rejecting the Finding of the July 2009
                  Medical Source Statement that Plaintiff is Limited to Light Work**

17          In the July 2009 Medical Source Statement, signed by Dr. Nguyen-Dinh, Nurse Practitioner

18  Suzuki found that Plaintiff was capable of lifting 10 pounds frequently and 25 pounds occasionally,

19  placing him in the "light work" range. *See* 20 C.F.R. §§ 404.1567(c).  In contrast, the examining

20  physician, Dr. Chen, found that Plaintiff had *no* limitations on lifting and therefore was capable of

21  heavy work.  In light of the conflicting medical opinions, the ALJ was required to provide "specific

22  and legitimate reasons" based on substantial evidence in the record, in support of his conclusion that

23  Plaintiff was able to perform medium work.  *See Lester*, 81 F.3d at 830 (citation omitted).  Here, the

24  ALJ declined to give controlling weight to the opinion of Nurse Practitioner Suzuki on the basis that

25  she did not meet with Plaintiff with much frequency and had not seen Plaintiff for over a year when

26  she completed the July 2009 Medical Source Statement, and because her opinion was not supported

27  by medical evidence and was contradicted by the medical record.  These are specific and legitimate

28

1    reasons for rejecting the opinion stated in the Medical Source Statement that Plaintiff was limited to

2    light work.

3          In determining the weight to which a treating physician's opinion is entitled, the duration of

4    the treatment relationship and the frequency and nature of the contact, should be considered.  20

5    C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Here, the record reflects that at the time Nurse

6    Practitioner Suzuki completed the Medical Source Statement, in July 2009, she had not treated

7    Plaintiff since March 2008.  She had seen Plaintiff one other time in 2008, twice in 2007 and once in

8    2006.  The relative lack of frequency of treatment provided by Nurse Practitioner Suzuki is a

9    specific and legitimate reason for declining to give great weight to her opinion.[5]

10          The ALJ also found that Nurse Practitioner Suzuki's opinion was not supported by the other

11   medical evidence in the record.  In particular, the ALJ cited the findings of other physicians, as well

12   as the conservative treatment of Plaintiff's neuropathy.  The Court does not find that the ALJ's

13   reliance on the "conservative treatment" Plaintiff received to offer a specific and legitimate reason

14   for rejecting the opinions stated in the July 2009 Medical Source Statement.  Although Dr. Silver

15   referred Plaintiff back to his primary care physician (twice) for medical management of his

16   neuropathy, Plaintiff did not follow up on this recommendation, making it is impossible to determine

17   what kind of treatment might have been recommended.  Nonetheless, the Court concludes that the

18   findings of other physicians that were cited by the ALJ *do* offer a legally sufficient basis on which

19   the ALJ could find that Plaintiff's neuropathy did not limit Plaintiff as severely Nurse Practitioner

20

21

22

23

24          [5]Because the ALJ gave specific and legitimate reasons for rejecting the opinions stated in the
     Medical Source Statement, the Court need not address whether the ALJ could properly reject the opinion
     stated in the Medical Source Statement on the grounds that it was completed by a nurse practitioner
25   rather than a physician.  In any event, the Commissioner concedes that the July 2009 Medical Source
     Statement was completed by an acceptable medical source because it was signed by Dr. Nguyen-Dinh.
26   Further, because the Court finds that the ALJ could properly conclude that the July 2009 Medical Source
     Statement overstated Plaintiff's exertional limitations, the Court need not reach the question of whether
27   the ALJ should have credited Nurse Practitioner's November 17, 2009 Letter stating that Plaintiff's
     symptoms would not have improved even if he had obtained further treatment. Even if the ALJ credited
28   this opinion, it would only mean that Plaintiff would not have been able to perform anything above
     medium-level work, regardless of whether he obtained treatment.

United States District Court

For the Northern District of California

1   Suzuki stated in the July 2009 Medical Source Statement, as discussed above in connection with

2   Step Three.[6]

3          Finally, the ALJ offered a specific and legitimate reason for rejecting Nurse Practitioner

4   Suzuki's opinion to the extent that he pointed to the medical evidence on which she relied in support

5   of her conclusion, namely, the x-rays and reports of the podiatrist, which indicated that Plaintiff had

6   only a "minor abnormality" and that there was no evidence of a foot deformity.

7          Therefore, the Court finds that the ALJ offered specific and legitimate reasons supported by

8   substantial evidence for rejecting the opinions expressed in the 2009 Medical Source Statement.

9          **2.     Whether the ALJ Erred in his Evaluation of Plaintiff's Credibility**

10         Plaintiff argues that the ALJ committed legal error in rejecting Plaintiff's testimony about the

11  severity of his symptoms because: 1) he failed to consider the entire case record in reaching his

12  conclusion; and 2) he did not provide clear and convincing reasons for finding Plaintiff lacked

13  credibility.  The Court finds that the ALJ offered sufficient reasons to support his finding that

14  Plaintiff's testimony about the severity of his neuropathy symptoms was not entirely credible.

15         Unless there is affirmative evidence showing that a claimant is malingering, the

16  Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing."

17  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995).  In making a credibility determination, the ALJ

18  must, in addition to assessing the objective medical evidence, consider the claimant's daily

19  activities, the "type, dosage, effectiveness, and side effects of any medication the claimant takes or

20  has taken to alleviate pain," treatment the claimant has received for relief of pain, and other factors

21  concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20

22  C.F.R. §§ 404.1529(c)(4);  SSR 96-7p.  Failure to seek treatment of a condition for which a claimant

23  has sought some treatment is "powerful evidence" that a claimant may be overstating the extent of

24  his or her pain.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  However, the ALJ is also

25  required to consider any reasons offered by the claimant for the failure to obtain treatment in

26

27         [6]The Court does not consider the cryptic notation by Nurse Practitioner Suzuki that may (or may not) indicate that she filled out a form stating that Plaintiff could work without limitations, which is cited by Defendant in its Motion.  This reason was not cited by the ALJ and therefore it is not appropriate for the Court to consider it here in determining whether the ALJ offered specific and legitimate reasons in support of his decision.

28

United States District Court<br>For the Northern District of California

1  determining the weight that should be given such evidence. *Fair v. Bowen*, 885 F.2d 597, 603 (9th

2  Cir. 1989).

3      Here, the ALJ found that Plaintiff's specific testimony regarding pain in his hands, feet and

4  fingertips was not credible because he has been taking care of a friend with multiple sclerosis,

5  including performing light chores.  In addition, he cited Plaintiff's failure to seek treatment for his

6  neuropathy for over a year, despite the recommendation of the podiatrist that he return to his primary

7  care practitioner for medical management of his neuropathy.  Finally, he noted that Plaintiff's

8  testimony that had could not arrange for transportation to the VA Clinic was not credible, especially

9  in light of his failure to produce any verification for this claim in response to the ALJ's request at the

10  hearing.

11      The Court finds that the reasons cited by the ALJ for declining to credit Plaintiff's pain

12  testimony are clear and convincing and therefore the ALJ did not err in concluding that Plaintiff

13  could perform medium work.  The Court finds that Plaintiff's failure to follow the recommendations

14  of Dr. Silver that he return to his primary care physician for treatment of his neuropathy to be

15  particularly powerful evidence supporting the ALJ's conclusion.  Although Plaintiff offered reasons

16  for failing to obtain further treatment for his neuropathy, he did not supplement the record (as he was

17  invited to do by the ALJ) with further information showing that he could not use a VA Clinic

18  shuttle; nor does Dr. Thomsen's report provide support for the contention that Plaintiff's mental

19  impairment precluded him from seeking treatment.  Indeed, Plaintiff obtained treatment at the VA

20  Clinic a number of times after he began to experience the severe anxiety caused by becoming

21  homeless.

22  **3.      Whether ALJ Erred by not Recontacting Nurse Practitioner Suzuki to**

23  **Clarify Her Conclusions on the Medical Source Statement**

24      An ALJ in a social security disability case has "a special duty to fully and fairly develop the

25  record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441,

26  443 (9th Cir.1983).  Thus, if an ALJ thinks he needs to know "the basis of [the physician's] opinions

27  in order to evaluate them," the ALJ must "conduct an appropriate inquiry" into the medical evidence

28  in question by recontacting the source. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  This

1   requirement is only triggered, however, when there is ambiguous evidence or the record  is

2   inadequate to allow for proper evaluation of the evidence.  *Mayes v. Massanari*, 276 F.3d 453, 459-

3   60 (9th Cir. 2001).  Further, an ALJ may "discharge this duty in several ways, including:

4   subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing

5   the hearing, or keeping the record open after the hearing to allow supplementation of the record."

6   *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

7            Here, the record was sufficient to evaluate Plaintiff's physical capabilities in light of his

8   neuropathy because it contained reports by the consultative examiner and the agency doctors that

9   allowed the ALJ to determine Plaintiff's limitations.  Further, the ALJ left the record open to allow

10  Plaintiff to address concerns expressed by the ALJ at the administrative hearing.  Therefore, the

11  Court concludes that the ALJ did not err by failing to fully develop the record.

12         **E.       Whether the ALJ Erred in His Step Five Determination that Plaintiff Can**
13                   **Perform Jobs That Exist In Significant Numbers in the National Economy**

14           Plaintiff contends that the ALJ erred in finding that Plaintiff was not disabled under Medical-

15  Vocational Guideline 203.04 because that Grid rule is applicable only where a claimant can perform

16  medium work.  Although the Court has found that the ALJ did not err in concluding that Plaintiff's

17  neuropathy limits him only to medium work, reliance on the Grids to find that Plaintiff is not

18  disabled is not appropriate in this case for another reason, namely, because Plaintiff has both

19  exertional *and* nonexertional impairments.[7]  *See Lounsbury v. Barnhart*, 468 F.3d 1111, 1116 (9th

20  Cir. 2006) ("Because the grids are not designed to establish automatically the existence of jobs for

21  persons with both severe exertional and non-exertional impairments, they may not be used to direct a

22  conclusion of nondisability"). In *Lounsbury*, the court explained:

23

24  ───────────────

25         [7]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength
    demands of jobs." 20 C.F .R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's
26  "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).
    Specific examples of non-exertional limitations offered in the regulations include "difficulty functioning
27  because [the claimant is] nervous, anxious, or depressed," "difficulty maintaining attention or
    concentrating," and "difficulty understanding or remembering detailed instructions."

28

**United States District Court**

For the Northern District of California

> Because the grids are not designed to establish automatically the existence of jobs for persons with both severe exertional and non-exertional impairments, they may not be used to direct a conclusion of . . . In other words, where a person with exertional and non-exertional limitations is "disabled" under the grids, there is no need to examine the effect of the non-exertional limitations. But if the same person is not disabled under the grids, the non-exertional limitations must be examined separately.

*Id.* Because the Grids do not cover all of Plaintiff's limitations, and in particular, fail to take into account his severe mental impairment, the ALJ's reliance on the Grids was improper. Rather, testimony of a vocational expert was required to establish that jobs existed in significant number in the national economy that Plaintiff could perform in light of his exertional *and non-exertional* impairments. *See Tackett v. Apfel,* 180 F.3d 1094, 1102 (9th Cir. 1999).

### F.    Remedy

"The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, "where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Id.* With respect to an ALJ's improper disregard of evidence:

> [T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id. See also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995) (Where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law'" (citation omitted)).

In this case, the Court credits the opinions expressed by Dr. Thomsen in her report, including her opinions that: 1) Plaintiff has severe impairments as to attention/concentration, executive functioning and visuospatial abilities; 2) he has moderate impairment of memory; 3) he suffers from severe anxiety; and 4) that due to his mental impairment he "could not sustain simple or complex tasks for up to eight hours and would become fatigued attempting to do so." Based on the current

record, however, the Court is unable to determine, whether there are jobs available in the national

economy in significant number that Plaintiff could perform in light of his exertional and non-

exertional impairments.  Accordingly, further proceedings are required.

**IV.     CONCLUSION**

        For the foregoing reasons, the Court GRANTS Plaintiff's Motion and DENIES Defendant's

Motion.  The Court reverses the ALJ's decision and remands Plaintiff's claim for further

administrative proceedings consistent with this opinion.  Upon remand, the Commissioner shall

credit the findings of Dr. Thomsen and consider whether Plaintiff is disabled in light of his

exertional and non-exertional impairments.

        IT IS SO ORDERED.

Dated: February 1, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge